# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**JENNIFER L. JOHNSON**
 **Plaintiff,**

 **v.**                                        **Case No. 19-C-856**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
 **Defendant.**

## DECISION AND ORDER

Plaintiff Jennifer Johnson applied for social security disability benefits, claiming that she could no longer work due to bipolar disorder, depression, and anxiety. Social security regulations set forth a five-step sequential test for determining disability, under which the adjudicator asks:

(1) Is the claimant working, i.e., engaging in "substantial gainful activity"?

(2) If not, does the claimant have a "severe" medically determinable physical or mental impairment?

(3) If so, does that impairment meet or equal one of the "Listings," a compilation of presumptively disabling impairments?

(4) If not, does the claimant retain the residual functional capacity ("RFC") to perform her past relevant work?

(5) If not, can the claimant, given her RFC, age, education, and work experience, make the adjustment to other work? If so, she is not disabled. If not, she is disabled. See 20 C.F.R. § 404.1520(a)(4).

An Administrative Law Judge ("ALJ") denied plaintiff's claim at step five, concluding that while plaintiff suffered from severe mental impairments, which limited her to simple, routine work involving limited interaction with others and precluded performance of her past employment, she remained capable of performing a significant number of jobs in the economy. Plaintiff seeks judicial review of that decision.

The court's task on judicial review is not to determine whether the claimant is disabled but rather whether the ALJ's decision denying the claim is supported by "substantial evidence" and free of harmful legal error. Stephens v. Berryhill, 888 F.3d 323, 327 (7th Cir. 2018). Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. L.D.R. v. Berryhill, 920 F.3d 1146, 1151-52 (7th Cir. 2019). The court may not, under this deferential standard, re-weigh the evidence or substitute its judgment for that of the ALJ. Id. at 1152.

Nevertheless, while "judicial review of the decisions of administrative agencies is deferential, it is not abject." Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010). The court cannot uphold a decision that fails to mention highly pertinent evidence, or that because of contradictions or missing premises fails to build a logical bridge between the facts of the case and the outcome. Id.

In this case, plaintiff argues that the ALJ failed to account for important evidence regarding her ability to maintain the "concentration, persistence, and pace" and "social interaction" necessary for work; failed to explain the basis for his conclusion that she would not be "off task" more than employers will tolerate; and failed to provide adequate reasons for discounting her statements regarding the severity of her symptoms. While I do not accept all of plaintiff's contentions, I do agree that the matter must be remanded.

2

# I. FACTS AND BACKGROUND

## A.    Plaintiff's Application and Reports

Plaintiff applied for benefits in November 2015, alleging that she became disabled as of July 24, 2015 due to bipolar disorder, migraines, depression, and social anxiety disorder.[1] (Tr. at 57, 161, 178.)  In a function report, plaintiff alleged that some days she was unable to get out of bed due to depression and anxiety causing panic attacks and an overwhelming feeling of not being able to succeed.  (Tr. at 196.)  If she did get up, she tried to do some chores, but some days she did not leave bed except to use the bathroom.  She also let her personal care slide due to the depression.  (Tr. at 197.)  She prepared simple meals once per day (most times her husband helped make dinner) and did household chores like dishes, laundry, and cleaning.  If unable to do dishes or laundry, her mother or husband took care of it.  (Tr. at 198.)

Plaintiff further reported that she tried to go out once per day but experienced anxiety being around people and usually shopped with her husband in case she had an anxiety attack.  Driving also caused increased anxiety.   She could handle finances.  (Tr. at 199.)

Plaintiff reported hobbies of crafting and watching TV.  She did not report problems getting along with family, friends, and neighbors.  (Tr. at 200.)  She alleged that her impairments affected memory, completing tasks, concentration, and getting along with others.  She could pay attention for 10-15 minutes, sometimes had to reread written instructions, and usually had to write down spoken instructions so as not to forget.  (Tr. at 201.)  She indicated

---

[1]The medical evidence also references carpal tunnel syndrome.  (E.g.,Tr. at 257.)  The agency found no severe physical impairments (Tr. at 60, 75-76), and plaintiff has not pressed the issue on appeal, so I do not discuss her physical condition further.

3

that she got along well with authority figures until she got frustrated or upset and lost control of her emotions. Finally, she reported that she did not handle stress or changes in routine well. (Tr. at 202.)

## B. Agency Decisions

### 1. Initial Level

The agency denied the application initially in January 2016, concluding that plaintiff remained capable of simple, routine work activities. In making this determination, the agency relied on the record review of Esther Lefevre, Ph.D. (Tr. at 67, 77, 86.)

Under the so-called "paragraph B" criteria of the mental impairment Listings, Dr. Lefevre found mild restriction of activities of daily living; mild difficulties in maintain social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration. (Tr. at 61.) Dr. Lefevre further found that plaintiff did not have understanding/memory limitations or concentration/persistence limitations, but did have social interaction limitations. Specifically, she found that while plaintiff was not significantly limited in her ability to interact appropriately with the public, ask simple questions and request assistance, or maintain socially appropriate behavior, she was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Dr. Lefevre wrote that plaintiff "should be capable of getting along with supervisors and coworkers with only minor conflicts; however high stress situations tend to exacerbate her anxiety and should be avoided." (Tr. at 63.) Finally, regarding workplace adaptation, Dr. Lefevre found that while plaintiff was not significantly limited in her ability to take appropriate

4

precautions from normal hazards, travel in unfamiliar places, or set realistic goals, she was moderately limited in the ability to respond to changes in the work setting. (Tr. at 63.) Dr. Lefevre concluded that plaintiff "would be suitable for work that does not require changing tasks from day to day, but rather has a fairly regular set of job duties and expectations." (Tr. at 63-64.)

Dr. Lefevre also summarized the medical evidence collected by the agency. (Tr. at 64.) The records showed that in March 2014 plaintiff sought treatment for anxiety and bipolar symptoms after being off medication for years and self-medicating with marijuana for 10 years. (Tr. at 250, 291-92.) A psychiatrist started plaintiff on Risperal (Tr. at 294),[2] and at a follow up visit the next month plaintiff stated that the medication "helped with my mood quite a bit" and "I am starting to feel better already." (Tr. at 295.) In July 2014, plaintiff reported that aside from one panic attack she had been feeling really good. (Tr. at 303.) In January 2015, she complained of trouble falling asleep, otherwise doing well. (Tr. at 309.) In April 2015, she reported stable mood, stating "overall, I am feeling pretty good." (Tr. at 312.) However, in July 2015, she reported quitting her job due to a change of owners and increased stress at work. She also complained her mood was going "downhill" (Tr. at 316), and her medications were increased (Tr. at 318). In August 2015, she reported feeling tired with the increased medication but with improved mood and anxiety. (Tr. at 319.) The psychiatrist adjusted her medication to cut down on the fatigue. (Tr. at 322.) In September 2015, plaintiff stated her mood was stable and the dose change had been "quite helpful." (Tr. at 323.) In December 2015, she complained of depressed mood with lack of sunshine, difficulty sleeping, and feeling bad about

---

[2]Risperdal (risperidone) is an anti-psychotic medicine used to treat schizophrenia and bipolar disorder. https://www.drugs.com/risperdal.html.

being unemployed. (Tr. at 326.) Her medications were increased, and she was told to get outside at least once per day. (Tr. at 329.)

### 2. Reconsideration Level

In February 2016, plaintiff requested reconsideration of the denial (Tr. at 90), claiming that her depression had taken a turn for the worse, which set off manic episodes and worsening anxiety. She reported that due to the anxiety and bipolar episodes she was emotionally unstable, unable to leave bed most of the time, and unable to take care of daily chores. (Tr. at 69, 208.)

The reconsideration level medical evidence indicated that at a January 2016 visit with her psychiatrist plaintiff reported that her mood had improved, but she was upset about weight gain. She was also excited about helping her mother-in-law with craft shows. (Tr. at 406.)

In February 2016, however, plaintiff reported feeling depressed for several weeks, with a manic episode the previous week. (Tr. at 415.) On exam, cognition and memory were normal, but she exhibited a depressed mood. (Tr. at 418.) The psychiatrist switched her from risperidone to Latuda, Geodon if not covered by insurance.[3] (Tr. at 419.)

In March 2016, plaintiff reported that her anxiety had improved a little on Geodon (insurance did not cover Latuda), but she experienced side effects including diarrhea and exhaustion. (Tr. at 427.) The psychiatrist modified the dose. (Tr. at 430.)

In April 2016, plaintiff reported the Geodon was not working well (Tr. at 437), and the

---

[3]Latuda (lurasidone) is an anti-psychotic medicine used to treat schizophrenia and episodes of depression associated with bipolar disorder. https://www.drugs.com/latuda.html. Geodon (ziprasidone) is also an anti-psychotic medication, used to treat schizophrenia and the manic symptoms of bipolar disorder. https://www.drugs.com/geodon.html.

6

psychiatrist switched her to Loxitane (Tr. at 440).[4]  At a follow up later that month plaintiff reported improvement on the new medication, without side effects.  (Tr. at 449.)  The psychiatrist slightly increased the dose to stabilize mood further.  (Tr. at 452.)

In May 2016, plaintiff reported she was pleased that the higher dose of Loxitane had been helping with her mood, and she was less anxious.  (Tr. at 459.)  The psychiatrist continued medication as is.  (Tr. at 462.)

However, in July 2016 plaintiff reported not doing well, profoundly depressed the past four weeks and highly anxious (Tr. at 473), and the psychiatrist switched her to Latuda (Tr. at 476).  At a follow up later that month, plaintiff stated she did not feel as agitated but continued to feel significantly depressed.  (Tr. at 483.)  The psychiatrist increased Latuda and added Trazodone to help with sleep.  (Tr. at 486.)

In August 2016, plaintiff reported some improvement on the increased dose of Latuda, with no side effects.  However, her anxiety continued to be high about leaving the house without her husband.  She also continued to feel depressed, but severely so less often.  (Tr. at 501.)

In September 2016, the agency sent plaintiff for a psychological evaluation with Steven Krawiec, Ph.D.  (Tr. at 363.)  Dr. Krawiec noted that plaintiff's speech was well-organized, understandable, and goal directed, although she came across as somewhat dispirited.  (Tr. at 363.)  Plaintiff complained of severe anxiety, which caused shortness of breath and nausea. She also reported anxiety attacks at least once per day, lasting 15 minutes to over an hour. (Tr. at 363.)  She further complained of depression, which caused low energy level.  (Tr. at

---

[4]Loxitane is an anti-psychotic medication used to treat schizophrenia. https://www.drugs.com/mtm/loxitane.html.

7

363-64.) She indicated that with a new medication her manic episodes significantly decreased. She reported taking Latuda and Trazodone. She was not in counseling. Treatment had diminished her mania but did not help the depression and anxiety. (Tr. at 364.) As for her daily activities, plaintiff reported spending a lot of time in bed. She may do some craft work but had not been doing much of that lately. (Tr. at 364.) She denied any community activities, indicating that she did not really go anywhere, especially without her husband. She indicated that she got along with other people OK. She was able to handle finances. (Tr. at 365.)

On mental status exam, plaintiff was oriented, and her remote memory and fund of information seemed grossly intact. On a short term memory task, she recalled three of three items on an immediate trial and after five minutes. Her attention and concentration ability was adequate for following and participating in the ongoing conversation. She also did a good job on a serial 2's task and on arithmetic computations. She did an adequate job on a similarities task and her performance on a proverbs task was mixed. (Tr. at 365.)

Dr. Krawiec also met with plaintiff's husband, who indicated that her bipolar was "uncontrollably bad." (Tr. at 365.) He also said she had anxiety, which caused problems getting out of bed some days. Some days she helped with household chores, some days not. (Tr. at 365.) She did not interact much with others, aside from family, and rarely left the house unless he was with her. (Tr. at 366.)

Dr. Krawiec diagnosed unspecified bipolar and related disorder, unspecified anxiety disorder with features of generalized anxiety disorder, and specific phobias (driving and leaving the house alone). (Tr. at 366-67.) He concluded that her mental health difficulties:

> could significantly interfere with her ability to get herself into and remain in the workplace and perform efficiently. That would relate to her ability to persist at tasks and maintain adequate pace.

8

> I believe that this individual has adequate cognitive capacity to understand and carry out simple job instructions. She did not display any notable difficulty with attention, concentration, or memory.
>
> I do not have reason to think that she would have trouble getting along with coworkers, supervisors, etc.
>
> Workplace changes and stresses would be unadvisable. Such things could exacerbate her mental health/emotional difficulties.

(Tr. at 366.)

David Biscardi, Ph.D., then reviewed the medical records and Dr. Krawiec's report, finding moderate restriction of activities of daily living; moderate difficulties in maintain social functioning; moderate difficulties in maintaining concentration, persistence, and pace; and no episodes of decompensation of extended duration. (Tr. at 77.) Dr. Biscardi further evaluated plaintiff's mental RFC ("MRFC"), finding that plaintiff did not have understanding/memory limitations but did have sustained concentration/persistence limitations. (Tr. at 79.) Specifically, Dr. Biscardi found plaintiff not significantly limited in the ability to carry out very short and simple instructions, sustain an ordinary routine without special supervision, and make simple work-related decisions, but moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted, and complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 79-80.)

Dr. Biscardi further found social interaction limitations. Specifically, he found plaintiff not significantly limited in the ability to ask simple questions or request assistance and maintain

9

socially appropriate behavior; moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors, and get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and markedly limited in the ability to interact appropriately with the general public. (Tr. at 80.)

Dr. Biscardi also found adaptation limitations. Specifically, he opined that while plaintiff was not significant limited in the ability to be aware of normal hazards and set realistic goals, she was moderately limited in the ability to respond appropriately to changes in the work setting and travel in unfamiliar places. (Tr. at 80.)

Dr. Biscardi concluded that plaintiff retained "the capacity to understand, remember, carry out and sustain performance of 1-3 step tasks (but would become overwhelmed if the procedures were more complicated), complete a normal workday, interact briefly/superficially with coworkers/supervisors with no public contact, and adapt to changes/stressors associated with simple routine competitive work activities." (Tr. at 81.)

Based on Dr. Biscardi's opinion, the agency denied reconsideration in September 2016. (Tr. at 84, 85, 91.) Plaintiff then requested a hearing before an ALJ. (Tr. at 96.)

## C.    Hearing Level

### 1.    Medical Evidence

Plaintiff continued to see her psychiatrist, and at their September 2016 appointment plaintiff reported that she continued to struggle with bipolar depression. Her motivation was poor, and she cried easily. She also reported increasing restless leg symptoms on the higher dose of Latuda. (Tr. at 511.) The psychiatrist ordered lab work and increased the dose of Latuda. (Tr. at 514.)

10

In November 2016, plaintiff reported an increased level of fatigue. She noticed a slight improvement with the higher dose of Latuda but was still struggling. (Tr. at 528.) The psychiatrist referred her to another physician regarding her sleep issues and increased Latuda. (Tr. at 532.)

In February 2017, plaintiff reported feeling anxious all day long. She indicated she could not see the sleep specialist for financial reasons. (Tr. at 549.) She was not seeing a counselor for the same reason. (Tr. at 549-50.) The psychiatrist started her on gabapentin for anxiety, an off label use.[5] (Tr. at 553.)

In March 2017, plaintiff reported no improvement in her anxiety, with continued significant agoraphobia. (Tr. at 560.) The psychiatrist increased gabapentin. (Tr. at 563.)

In April 2017, plaintiff stated her anxiety was under better control, but she continued to feel profoundly depressed. (Tr. at 570.) The psychiatrist started her on lithium.[6] (Tr. at 574.) Later that month, plaintiff reported "a little bit of improvement" on lithium (Tr at 592), and the psychiatrist increased the dose (Tr. at 595).

In June 2017, plaintiff reported significant improvement in her mood on the increased lithium. She was frustrated by weight gain. (Tr. at 603.) The psychiatrist decreased Latuda. (Tr. at 606.) Later that month, plaintiff reported her mood had been "better" since the last visit. (Tr. at 620.) Her anxiety had improved as well. She was riding her bike outside twice a day without worry. (Tr. at 621.) The psychiatrist decreased Latuda, continued lithium as is. (Tr.

---

[5]Gabapentin is an anti-epileptic drug, also called an anti-convulsant, generally used to treat neuropathic (nerve) pain. https://www.drugs.com/gabapentin.html.

[6]Lithium is a mood stabilizer used to treat or control the manic episodes of bipolar disorder. https://www.drugs.com/lithium.html.

11

at 624.)

In August 2017, plaintiff reported feeling tired throughout the day and feeling more depressed because she was having trouble sleeping at night. Her anxiety was manageable. (Tr. at 632.) The psychiatrist decreased Latuda and increased gabapentin. (Tr. at 635.) Later that month, plaintiff reported improved anxiety with the increased gabapentin but increased depression with the decreased Latuda. (Tr. at 643.) The psychiatrist continued her medications. (Tr. at 646.)

In October 2017, plaintiff reported better mood stability, especially as it related to mania, on lithium. She did report continued depression. She had run out of Latuda and there was a problem with insurance getting a refill. (Tr. at 652.) The psychiatrist continued lithium and gabapentin. They continued her off Latuda but may consider another medication the next month. (Tr. at 655.)

In November 2017, plaintiff's only concern was that she continued to have intermittent anxiety. She was hopeful for the future. (Tr. at 667.) The psychiatrist continued her medications as is. (Tr. at 670.)

In January 2018, plaintiff reported her mood had been stable since the last visit, and she was able to get out of the house more easily in regards to anxiety. (Tr. at 678.) The psychiatrist again continued her medications as is. (Tr. at 681.)

**2.    Testimony**

On April 17, 2018, plaintiff appeared with counsel for her hearing before the ALJ. The ALJ also summoned a vocational expert ("VE") to offer testimony on jobs plaintiff might be able to do. (Tr. at 27-28.)

12

### a.    Plaintiff

Plaintiff testified that she was 36 years old, with a high school level education.  (Tr. at 32-33.)  She was married and lived in a house with her husband and various relatives.  (Tr. at 34.)  She had not worked since her alleged onset date in 2015.  (Tr. at 35-36.)  In 2014/15, she worked as a housekeeper/laundry person at a hotel.  She testified that she quit that job because the owner was rushing everyone, which gave her more anxiety and caused break downs at work.  (Tr. at 37.)  Prior to that, she worked as a customer service rep from 2004 to 2014 and as a front desk host from 2002 to 2006.  (Tr. at 38.)

Plaintiff testified that she did crafts, such as painting picture frames, putting puzzles together, and sewing.  She helped her mother-in-law for craft shows, making some things for her to sell.  (Tr. at 39.)  However, plaintiff did not attend the craft shows herself because too many people were there.  (Tr. at 40.)

Asked how she otherwise spent her time, plaintiff testified that she did not do much.  Sometimes, she slept all day.  Other days, she may do some laundry or possibly clean the bathroom.  (Tr. at 40.)  She used a computer to go on Facebook and watched TV if not sleeping.  She did not like going out in public.  (Tr. at 41.)

Plaintiff testified that she was diagnosed with bipolar disorder at the age of 17 or 18.  She was hospitalized in June 2006 after going off her medication.  (Tr. at 42.)  She got back on her medications in 2013 or 2014.  (Tr. at 42-43.)  She indicated that the medications did help.  (Tr. at 43.)  Leaving her house caused increased anxiety.  (Tr. at 44.)  She further testified that she sometimes did not shower for a week at a time, until her husband told her to, because she was too depressed.  (Tr. at 46.)  She also testified to increased anxiety being around other people, even people she knew.  Three to four days per week she slept most of

the day. (Tr. at 47.) She indicated that medication changes had addressed her mania, but the depression and anxiety were still there. She thought about suicide all the time, but said she would not do that to her family. Her concentration was also poor; she "zone[d] out all the time." (Tr. at 48.) Her medications cause side effects of hand tremor and diarrhea. (Tr. at 49.)

### b. VE

The VE classified plaintiff's past work as housekeeper/laundry aide, light, unskilled; customer service representative, sedentary, semi-skilled; and front desk agent, light, semi-skilled. (Tr. at 51.) The ALJ then asked a hypothetical question, assuming a person limited to medium work; allowed to be off task 10% of the day, in addition to regular breaks; limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements involving only simple work-related decision and few, if any, workplace changes; and having no contact with the general public and only occasional contact with co-workers and supervisors. (Tr. at 51-52.) The VE testified that such a person could not perform plaintiff's past work, which required public interaction. However, the person could do other jobs, such as inspector and hand packager, assembler, and mail sorter at the light level, and laundry worker, cleaner, and janitor at the medium level. (Tr. at 52-53.) Adding a limitation of avoiding all use of moving machinery and exposure to unprotected heights would remove the laundry worker and janitor jobs, but the person could also work as a packager or parts picker at the medium level; the light jobs would not be affected. (Tr. at 53-54.) Three or more absences per month would be work preclusive. (Tr. at 54.)

### D. ALJ's Decision

On August 16, 2018, the ALJ issued an unfavorable decision. (Tr. at 10.) The ALJ

14

determined at step one that plaintiff had not engaged in substantial gainful activity since July 24, 2015, the alleged onset date (Tr. at 15), and at step two that she had the severe impairments of bipolar disorder, depression, and social anxiety disorder (Tr. at 15-16). At step three, the ALJ evaluated plaintiff's depressive and anxiety disorders under Listings 12.04 and 12.06, which are met if the claimant was one "extreme" or two "marked" limitations under the "paragraph B" criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace ("CPP"); and (4) adapting or managing oneself. (Tr. at 16.)[7]

The ALJ found moderate limitations in understanding, remembering, or applying information, citing Dr. Krawiec's finding that plaintiff's cognitive capacity would limit her to understanding and carrying out only simple job instructions (Tr. at 16, 366), and Dr. Biscardi's determination that plaintiff could carry out one-to-three step tasks but would likely be overwhelmed by complicated procedures. (Tr. at 16, 81). However, he declined to find greater limitation in this area, citing Dr. Krawiec's observation of no notable difficulties with memory during the evaluation, which was consistent with other mental status exams describing intact memory and cognition. (Tr. at 16-17, 297, 301, 305, 308, 314, 365-66, 408, 475, 646.)

The ALJ also found moderate limitation in interacting with others. The ALJ cited Dr. Biscardi's finding that plaintiff would have marked difficulties dealing with the public and

---

[7]In January 2017, the agency changed the paragraph B criteria from (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation, to (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. Swoverland v. Saul, No. 19-C-824, 2020 U.S. Dist. LEXIS 60926, at *27 n.2 (E.D. Wis. Apr. 7, 2020). As I have indicated in other cases, this change does not impact the Seventh Circuit's CPP case-law. Id.

moderate limitations getting along with co-workers, accepting instructions from supervisors, and responding appropriately to supervisory criticism (Tr. at 17, 80); record evidence of a history of social anxiety and irritability (Tr. at 17, 253, 303); and plaintiff's function report, in which she noted that she rarely interacts socially and becomes frustrated with authority figures due to problems controlling her emotions (Tr. at 17, 201-02). However, Dr. Biscardi also found that plaintiff would have no significant limitations with regard to asking simple questions, requesting assistance, maintaining socially appropriate behavior, or adhering to basic standards of neatness (Tr. at 17, 80); Dr. Krawiec stated that plaintiff would not have difficulty getting along with co-workers and supervisors (Tr. at 17, 366); record evidence described plaintiff's pleasant, cooperative demeanor (Tr. at 17, 358); and plaintiff's function report indicated that she had no problem getting along with family, friends, and neighbors (Tr. at 17, 200-01).

The ALJ also found moderate limitations in CPP. Dr. Biscardi determined that plaintiff would have moderate limitations performing activities within a schedule, maintaining regular attendance, maintaining concentration/attention, completing a normal workweek/workday, performing at a consistent pace, and carrying out detailed instructions (Tr. at 17, 79); and in her function report plaintiff reported concentration difficulties as well as problems completing tasks (Tr. at 17, 201). However, according to Dr. Biscardi, plaintiff would have no significant limitations making simple work-related decisions, sustaining an ordinary routine without special supervision, or carrying out short, simple instructions (Tr. at 17, 79); and according to Dr. Krawiec, plaintiff did not exhibit any notable concentration/attention difficulties during her evaluation, and her attention/concentration was adequate for following and participating in conversation (Tr. at 17, 366).

Finally, the ALJ found no limitation in adapting or managing onself. Plaintiff reported

16

generally normal activities of daily living, she engaged in various hobbies (Tr. at 17, 198-201, 364), and Dr. Biscardi indicated that she could adapt to changes/stressors associated with simple, routine, competitive work activities (Tr. at 17, 81).

The ALJ acknowledged that the limitations identified under paragraph B were not an RFC assessment. The mental RFC assessment used at steps four and five required a more detailed assessment, and the ALJ wrote that the RFC he adopted reflected the degree of limitation he found in the paragraph B mental functional analysis. (Tr. at 18.)

The ALJ then adopted an RFC limiting plaintiff to simple, routine, repetitive tasks performed in a work environment free from fast-paced production requirements and involving only simple work-related decisions with few, if any, workplace changes. Further, in addition to unscheduled breaks, plaintiff would be off task up to 10% of the workday. Finally, she was limited to only occasional contact with co-workers and supervisors and no contact with the general public. (Tr. at 18.)

In making this finding, the ALJ considered plaintiff's symptoms and the extent to which these symptoms could "reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p." (Tr. at 18.) He also considered the medical opinion evidence under 20 C.F.R. § 404.1527. (Tr. at 18.)

Regarding the symptoms, the ALJ acknowledged the required two-step process, under which he had to first determine whether plaintiff had an underlying medically determinable impairment that could reasonably be expected to produce the symptoms. Second, once such an impairment had been shown, he had to evaluate the intensity, persistence, and limiting effects of the symptoms. For this purpose, if the symptoms were not substantiated by objective

17

medical evidence, the ALJ had to consider the other evidence in the record to determine if the symptoms limited plaintiff's ability to do work-related activities. (Tr. at 18.)

Plaintiff alleged disability based on a range of mental health-related symptoms, including depressed mood, social anxiety, appetite disturbance, low energy, excessive worry, manic episodes, social avoidance, and decreased interest in social activities. She also reported frequent panic attacks, occurring daily, as well as memory deficits and concentration difficulties. Finally, she described difficulties handling stress and dealing with changes in routine. She alleged that these symptoms prevented her from engaging in all work-related activities. (Tr. at 19.)

The ALJ then stated:

After careful consideration of the evidence, the undersigned finds that [plaintiff's] medically determinable impairments could reasonably be expected to cause the alleged symptoms. However, for the reasons discussed below, her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence in the record.

(Tr. at 19.) The ALJ provided three reasons for this finding.

First, while the record described symptoms that would limit plaintiff's overall functioning, the objective medical evidence failed to support the alleged severity and limiting effects of plaintiff's impairments. For instance, Dr. Krawiec's mental status exam was generally normal, describing intact memory, adequate concentration skills, and full orientation. Plaintiff also performed well on arithmetic computations, adequately on similarities tasks, and did a good job on serial twos. (Tr. at 19, 365.) Other mental status exams in the record, while noting depressed/anxious mood, were generally unremarkable as well, describing normal speech, normal behavior, normal thought content, intact memory, normal cognition, and normal judgment. (Tr. at 19, 297, 301, 305, 308, 311, 314, 408, 418, 429.) She was also oriented and

18

exhibited no paranoia, delusions, or suicidal/homicidal ideation. (Tr. at 19, 251, 297, 301, 305, 308, 311, 314, 408, 418, 429.)

Second, plaintiff reported improved symptoms with treatment, including the medications Loxitane, which she said improved her mood and lessened her anxiety (Tr. at 19, 449); Xanax, which "really helps calm her down enough . . . to function" (Tr. at 19, 291); Risperdal, which stabilized her symptoms and helped her mood "quite a bit" (Tr. at 19, 295); and Lithium, saying her mania was "better" on this medication (Tr. at 19, 652). In other treatment records, her doctor noted that she was "doing better from a mood perspective." (Tr. at 19, 298.)

Third, the ALJ stated that plaintiff's impairments did not appear to interfere significantly with her daily activities, as evidenced by her ability to prepare meals, perform household chores, drive, shop, and handle finances. (Tr. at 19, 198-99.)

As for the opinion evidence, Dr. Krawiec determined that plaintiff would have adequate cognitive capacity to understand and carry out simple job instructions, but that workplace changes and stress were not advisable. (Tr. at 19, 366.) The ALJ noted that Dr. Krawiec is an expert who based his opinion on a thorough mental status examination. (Tr. at 19.) Moreover, the ALJ found his opinion generally consistent with the overall evidence, including mental status examinations and Dr. Biscardi's opinion limiting plaintiff to understanding, remembering, and carrying out simple tasks. (Tr. at 19-20, 81.) The ALJ therefore gave this opinion some weight and incorporated appropriate limitations in the RFC. (Tr. at 20.)

The ALJ gave great weight to Dr. Biscardi's opinion, which described a range of limitations, including moderate limitations in social interaction and CPP. (Tr. at 20, 79-80.) The ALJ found Dr. Biscardi's opinion consistent with the overall record, including evidence of social anxiety/avoidance, irritability, mood changes, and concentration difficulties, all of which would

19

cause limitations in these areas. The ALJ accordingly included limitations in the RFC and paragraph B criteria to address Dr. Biscardi's assessment. (Tr. at 20.)

The ALJ gave some weight to the opinion of Dr. Lefevre, who noted moderate social interaction limitations but did not include limitations related to understanding/memory or concentrating/persisting. (Tr. at 20, 63-64.) The ALJ found that Dr. Biscardi had access to more medical evidence, and that his opinion was more consistent with treatment notes, mental status exams, and the consultative examiner's report, so he gave more weight to his opinion. (Tr. at 20.)

The ALJ concluded:

> In sum, while [plaintiff's] impairments cause some functioning difficulties, the overall record failed to demonstrate disabling symptoms. Mental status examinations were generally unremarkable; [plaintiff] exhibited improved symptoms with treatment; and she engaged in relatively normal daily activities. Such evidence, in combination with the consistent medical opinions of record, supports [plaintiff's] residual functional capacity and suggests that her impairments are less limiting than alleged.

(Tr. at 20.)

At step four, the ALJ determined that plaintiff could not perform her past relevant work as a housekeeper/laundry aide, customer service representative, and desk agent. (Tr. at 20-21.) At step five, however, the ALJ found that plaintiff could perform other jobs, as identified by the VE, including cleaner, packager, and parts picker. (Tr. at 21.) He accordingly found her not disabled. (Tr. at 22.)

On April 10, 2019, the Appeals Council denied review (Tr. at 1), making the ALJ's decision the final word from the Commissioner on plaintiff's application. See Jozefyk v. Berryhill, 923 F.3d 492, 496 (7th Cir. 2019). This action followed.

20

## II. DISCUSSION

### A.    Dr. Biscardi's Opinion

Plaintiff argues that the ALJ failed to account for CPP and social interaction limitations set forth in Dr. Biscardi's opinion, which the ALJ gave great weight. (Pl.'s Br. at 19-22.)  While an ALJ need not rely entirely on a particular doctor's report in determining RFC, see Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007), he may not selectively consider medical reports, Myles v. Astrue, 582 F.3d 672, 678 (7th Cir. 2009).  "Especially where, as here, the ALJ gives a medical opinion great weight, the ALJ must explain why limitations included in the opinion are not included in the RFC."  Smith v. Colvin, 9 F. Supp. 3d 875, 887 (E.D. Wis. 2014).

As indicated above, Dr. Biscardi found moderate limitations in CPP.  (Tr. 77.)  More specifically, he found plaintiff moderately limited in the ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, work in coordination with or proximity to others without being distracted, and complete a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. at 79-80.)

The ALJ accepted the moderate CPP limitation (Tr. at 17, 20), but the RFC omitted such a limitation, as well as the more particular findings set forth in Dr. Biscardi's report.  See Crump v. Saul, 932 F.3d 567, 570 (7th Cir. 2019) ("Our caselaw emphasizes that 'both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record,' including even moderate limitations in concentration, persistence, or pace.") (quoting Varga v. Colvin, 794 F.3d 809, 813 (7th Cir.

21

2015)); <u>DeCamp v. Berryhill</u>, 916 F.3d 671, 675-76 (7th Cir. 2019) (reversing where the RFC omitted moderate limitations in maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination or proximity to others without being distracted; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace).

As the Seventh Circuit has held, limiting a claimant to simple, routine tasks with no fast-paced production requirements and involving only simple work-related decisions with few, if any, workplace changes, as the ALJ did here (Tr. at 18), will not suffice to capture moderate limitations in CPP. <u>See</u> <u>Crump</u>, 932 F.3d at 570; <u>DeCamp</u>, 916 F.3d at 675-76; <u>Varga</u>, 794 F.3d at 815. This is so because the ability to perform simple and repetitive tasks says nothing about whether the individual can do so on a sustained basis, including, for example, over the course of a standard eight-hour work shift. <u>Crump</u>, 932 F.3d at 570. Further, a limitation on workplace changes deals largely with workplace adaptation, rather than CPP. <u>Varga</u>, 794 F.3d at 815. And, without a definition, the term "fast paced production" will not permit a VE to assess whether a person with the claimant's limitations could maintain the pace proposed. <u>Id.</u>

As the Commissioner notes, the ALJ may in some cases rely on a consultant's narrative explanation, which "translates" specific findings into an RFC. (Def.'s Br. at 10-11, citing <u>Capman v. Colvin</u>, 617 Fed. Appx. 575, 597 (7th Cir. 2015); <u>Johansen v. Barnhart</u>, 314 F.3d 283, 288-89 (7th Cir. 2002).) "But even if an ALJ may rely on a narrative explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in [earlier] sections of standardized forms such as the . . . MRFC forms." <u>DeCamp</u>, 916 F.3d at 676 (citing <u>Yurt v. Colvin</u>, 758 F.3d 850, 859 (7th Cir. 2014)); <u>see also</u>

22

<u>Mischler v. Berryhill</u>, 766 Fed. Appx. 369, 376-77 (7th Cir. 2019) ("Because Dr. Rozenfeld's assessment fails to account for all of Mischler's limitations, the ALJ was required to account for them himself—in the hypothetical and RFC. But he did not.").[8]

Moreover, even if the ALJ could have relied on Dr. Biscardi's narrative, the RFC he actually adopted varied from it. Dr. Biscardi opined that plaintiff could handle "1-3 step tasks (but would become overwhelmed if the procedures were more complicated)" and "interact briefly/superficially with coworkers/supervisors with no public contact." (Tr. at 81.) The ALJ limited plaintiff to "simple, routine, repetitive tasks" and "only occasional contact with co-workers and supervisors and no contact with the general public." (Tr. at 18.)

Plaintiff contends that a limitation to one-to-three step tasks is more restrictive than a limitation to simple, routine, repetitive tasks. (Pl.'s Br. at 20.) However, the case she cites, <u>Ragsdale v. Saul</u>, No. 18-CV-946, 2019 U.S. Dist. LEXIS 113130, at *8-9 (E.D. Wis. July 8, 2019), involved a situation where the ALJ adopted an RFC for "work that is unskilled with one, two, or three step instructions," but he omitted the additional (and ostensibly more restrictive) limitation to "one, two or three step instructions" from his hypothetical question to the VE. The ALJ did not make that mistake here.[9] More persuasive is plaintiff's argument that an RFC for "occasional contact with co-workers and supervisors" fails to capture Dr. Biscardi's limitation to "superficial" interaction. As courts have noted, the former covers <u>quantity</u> of interaction,

_____

[8]As the Commissioner notes, the ALJ acknowledged the various "moderate" limitations outlined in section I of Dr. Biscardi's MRFCA report. (Def.'s Br. at 10, citing Tr. at 17.) However, the ALJ did not account for those limitations in the RFC.

[9]It is unnecessary in this case to wade into the debate over whether "unskilled" work is equivalent to work involving one-to-two step tasks. <u>See, e.g.</u>, <u>Mattison v. Astrue</u>, No. 09-C-60, 2009 U.S. Dist. LEXIS 81056, at *88-92 (E.D. Wis. Aug. 21, 2009); <u>Meissl v. Barnhart</u>, 403 F. Supp. 2d 981, 983 (C.D. Cal. 2005).

while the latter involves quality of interaction. Vera v. Berryhill, No. 2:17-cv-377, 2019 U.S. Dist. LEXIS 88770, at *9-10 (N.D. Ind. May 28, 2019). "On remand, the ALJ must either adopt [Dr. Biscardi's] qualitative interaction limitation or adequately explain why he did not." Id. at *10; see also Eveland v. Berryhill, No. 2:16-CV-203-PRC, 2017 U.S. Dist. LEXIS 133667, at *14 (N.D. Ind. Aug. 22, 2017) ("The ALJ can either incorporate Dr. Johnson's limitation to 'superficial interaction' with coworkers and supervisors or explain why he rejects the limitation in favor of 'occasional interaction' with coworkers and supervisors.").

## B.    Time Off Task Percentage

The ALJ also included a "time off task" limitation in the RFC, concluding that plaintiff would be off task no more than 10% of the workday, in addition to scheduled breaks. (Tr. at 18.) This may have been intended to account for plaintiff's CPP limitations. See Crump, 932 F.3d at 570.

Citing Lanigan v. Berryhill, 865 F.3d 558, 563 (7th Cir. 2017), plaintiff complains that the ALJ did not explain the basis for the percentage. (Pl.'s Br. at 9.) In Lanigan, the court reversed based on the ALJ's failure to "establish a logical connection between the evidence and his conclusion" that the claimant would not be off task more than 10% of the time. Plaintiff cites various other cases remanding under Lanigan. (Pl.'s Br. at 9-10.)[10]

---

[10]Although the VE was not specifically asked about the percentage in this case, it seems well established that a person off task more than 10% of the time cannot maintain competitive employment. See, e.g., Lanigan, 865 F.3d at 563 ("Significantly, the vocational expert testified that persons who will be off task less than 10% of the workday are capable of maintaining fulltime employment. But those who will be off task more than 10% of the time, the expert acknowledged, will be incapable of maintaining competitive employment and thus are disabled."); Van Remmen v. Saul, No. 18-C-965, 2019 U.S. Dist. LEXIS 149437, at *18 (E.D. Wis. Aug. 31, 2019) ("According to the VE, any time off-task greater than 10% would be work preclusive.").

24

In response, the Commissioner contends that the ALJ sufficiently explained his determination. (Def.'s Br. at 5.) The ALJ acknowledged plaintiff's reports of concentration difficulties and problems completing tasks (Tr. at 17, 201), but he credited Dr. Biscardi's opinion that she would have no significant limitation in "sustaining an ordinary routine" (Tr. at 17, 79) and Dr. Krawiec's observation that she did not display "any notable concentration/attention difficulties during her evaluation" (Tr. at 17, 366). The Commissioner further notes that no doctor opined to greater limitations related to time off task than outlined in the RFC; while plaintiff complains that the ALJ failed to cite evidence substantiating the percentage, plaintiff bore the burden of submitting evidence establishing the severity of her impairments, and she does not now point to any record evidence supporting her claim that she would be off task more than 10% of they day. (Def.'s Br. at 5-6.) The Commissioner thus concludes that any error in failing to further explain this finding was harmless. (Def.'s Br. at 7.)

In reply, plaintiff indicates that the Commissioner failed to mention or make any effort to distinguish the Seventh Circuit's controlling precedent in Lanigan. (Pl.'s Rep. Br. at 1-2.) However, Lanigan did not create a per se rule of reversal whenever the ALJ fails to specifically explain a time off task percentage. In that case, the claimant presented un-rebutted testimony that he took unscheduled breaks (sometimes for 20 minutes) three to five times during his five-hour work shifts, which would have caused him to be off-task more than 10% of the time, and the ALJ failed to explain how the state agency psychologists' opinions supported his finding or why he credited those reports over the opinion of the claimant's long-time counselor. Lanigan, 865 F.3d at 563.

In cases where the record lacks evidence supporting a greater percentage, the absence of such an explanation may be harmless. Compare Jackson v. Saul, No. 19-CV-290, 2020

25

U.S. Dist. LEXIS 22405, at *6 (E.D. Wis. Feb. 10, 2020) ("No doctor opined that Jackson would be off task a particular percentage of the workday, and Jackson did not testify with specificity on her need to take breaks or general off-task behavior."), and Wagner v. Saul, No. 17-cv-159-wmc, 2019 U.S. Dist. LEXIS 143578, at *11 (W.D. Wis. Aug. 23, 2019) ("Unlike many other cases with a similar challenge to a seemingly arbitrary 10% off-task limitation, plaintiff is unable to point to any opinion of a treating physician suggesting a greater discount is appropriate."), with Swoverland, 2020 U.S. Dist. LEXIS 60926, at *43 (remanding under Lanigan where the record contained evidence that the claimant had difficulty focusing, concentrating, and finishing tasks due to ADHD and the residual effects of seizures); and Post v. Saul, No. 19-CV-508, 2020 U.S. Dist. LEXIS 22396, at *7 (E.D. Wis. Feb. 10, 2020) ("An ALJ who includes an off-task percentage in the RFC must explain why he rejected evidence that a claimant would be off-task a greater percentage of time than the ALJ found.").

Plaintiff makes no effort to identify evidence supporting a greater time off task percentage. Rather, she contends that: "Once the ALJ concluded Johnson had a deficit that leads to off-task behavior, he needed an evidentiary basis for pegging the degree of limitation at 10%. If he goes down the road of a percentage limitation, he cannot randomly assign the percentage." (Pl.'s Rep. Br. at 2.) Courts within this circuit have declined to read Lanigan that broadly. See Nina Joyce H. v. Saul, No. 18 C 4913, 2020 U.S. Dist. LEXIS 6314, at *24 n.12 (N.D. Ill. Jan. 14, 2020) (distinguishing Lanigan "because the ALJ in that case rejected a claimant's 'unrebutted testimony' about his limitations, while in this case, the ALJ explained that Plaintiff's testimony was rebutted by the record evidence"); Ball v. Saul, No. 18-cv-888-jdp, 2019 U.S. Dist. LEXIS 123791, at *9 (W.D. Wis. July 25, 2019) ("Lanigan is distinguishable because the plaintiff in that case pointed to evidence that he would be off-task more often than

the amount found by the ALJ. Ball cites no evidence or even identifies a reason why she would be off-task more than 10 percent of the work day.") (internal citation omitted); see also Van Remmen, 2019 U.S. Dist. LEXIS 149437, at *19 ("The ALJ's finding of an off-task limitation of up to 10% of the work day is based on his judgment as to what effect Van Remmen's symptoms might have on her ability to work; it is not a specific measurement.").

Nevertheless, while I decline to find per se error under Lanigan, I have already determined that the matter must be remanded for reconsideration of Dr. Biscardi's report, which contains findings relevant to plaintiff's ability to stay on task. Dr. Krawiec also observed that plaintiff's mental health difficulties "could significantly interfere with her ability to get herself into and remain in the workplace and perform efficiently. That would relate to her ability to persist at tasks and maintain adequate pace." (Tr. at 366.) On remand, the ALJ should explain the basis for his conclusion that plaintiff would not be off task more than employers will tolerate.

## C.    Symptom Evaluation

Plaintiff also challenges the ALJ's symptom evaluation. (Pl.'s Br. at 10.) As the ALJ acknowledged, symptom evaluation is a two step process. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work. Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities, factors that precipitate and aggravate the symptoms, and the treatment she has

27

received for relief of the pain or other symptoms. Id. at *18-19; 20 C.F.R. § 404.1529(c)(3). The ALJ must then provide specific reasons for his finding, consistent with the regulatory factors and supported by the evidence in the record. Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008). On review, the court affords considerable deference to the ALJ's finding, reversing only if it is "patently wrong." Ray v. Berryhill, 915 F.3d 486, 490 (7th Cir. 2019).

Here, the ALJ found that while plaintiff's impairments could reasonably be expected to cause her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of these symptoms "were not entirely consistent" with the evidence of record. In support, he cited (1) the objective medical evidence, (2) plaintiff's improvement with treatment, and (3) her daily activities. (Tr. at 19.)

Relying on Farley v. Berryhill, 314 F. Supp. 3d 941, 946 (N.D. Ill. 2018), plaintiff argues that the ALJ applied the wrong legal standard when he said her statements were "not entirely consistent" with the evidence. (Pl.'s Br. at 18-19.) This boilerplate language, which routinely appears in ALJ decisions, does not align with the applicable Ruling and regulation. See SSR 16-3p, 2016 SSR LEXIS 4, at *2-3 ("In determining whether an individual is disabled, we consider all of the individual's symptoms, including pain, and the extent to which the symptoms can reasonably be accepted as consistent with the objective medical and other evidence in the individual's record."); 20 C.F.R. § 404.1529(a) ("In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence."). Instead, as the Farley court and others have noted, the boilerplate suggests that the claimant's statements must be "entirely consistent" with the record, rather than "reasonably consistent." See also Minger v. Berryhill, 307 F. Supp. 3d 865, 871 (N.D. Ill. 2018) (noting that

28

the boilerplate suggests a "more rigorous" standard than the regulation).

As other courts have noted, however, "inclusion of the 'not entirely consistent' boilerplate language does not, by itself, serve as a basis for remand." Giboyeaux v. Comm'r of Soc. Sec., No. 2:19-cv-00076, 2020 U.S. Dist. LEXIS 14868, at *11 (N.D. Ind. Jan. 9, 2020) (collecting cases); see also Oliver v. Saul, No.: 1:19-CV-29, 2020 U.S. Dist. LEXIS 55894, at *11 (N.D. Ind. Mar. 31, 2020) ("This language is not necessarily fatal so long as the ALJ fully explains his decision and a 'commonsensical reading' of the entire decision suggests no error."); Wolfgram v. Berryhill, No. 18-C-1678, 2020 U.S. Dist. LEXIS 14070, at *49-50 (E.D. Wis. Jan. 27, 2020) (finding any error harmless where the ALJ correctly stated the legal standard elsewhere in the decision and provided specific reasons for his finding grounded in the evidence). Here, the ALJ correctly stated the regulatory standard earlier in his decision (Tr. at 18: "the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSR 16-3p"), and he provided specific reasons after the boilerplate (Tr. at 19). Therefore, I cannot conclude that use of the boilerplate alone would require remand. See Schomas v. Colvin, 732 F.3d 702, 708 (7th Cir. 2013) ("The use of boilerplate is innocuous when, as here, the language is followed by an explanation for rejecting the claimant's testimony.").

Plaintiff also takes issue with each of the reasons the ALJ provided. First, regarding the objective medical evidence, plaintiff contends that the ALJ's reliance on her "generally unremarkable" mental status exams ignores the nature of her disorders. (Pl.'s Br. at 11.) She indicates that the findings of normal speech, behavior, thought content, memory, and cognition do not inform as to the degree of her affective and anxiety disorders; her primary claims are

29

that her depression renders her unable to get out of bed at times and her anxiety makes it hard to leave home, not that she is cognitively disabled or delusional. She further notes that her psychiatrist recorded depressed or anxious mood at most visits, and contends that the ALJ erred by failing to even acknowledge that these abnormal mood findings were consistent with her allegations. (Pl.'s Br. at 12.)

The ALJ was required to consider the objective medical evidence as part of his analysis, 20 C.F.R. § 404.1529(c)(2), and plaintiff does not factually dispute the ALJ's observation that her mental status exams were generally normal. (Tr. at 19, 251, 297, 301, 305, 308, 311, 314, 408, 418, 429.) Nor does she dispute the ALJ's reliance on Dr. Krawiec's exam findings of intact memory, adequate concentration skills, full orientation, and good performance on testing. (Tr. at 19, 365.) Finally, the ALJ specifically acknowledged the exams "noting depressed/anxious mood." (Tr. at 19.) The ALJ did not ignore a line of evidence contrary to his findings. See, e.g., Zurawski v. Halter, 245 F.3d 881, 888-89 (7th Cir. 2001). While perhaps the ALJ could have discounted the significance of "normal" mental status exams given the nature of plaintiff's impairments, plaintiff fails to demonstrate that it was patently erroneous not to do so.

Plaintiff's challenges to the ALJ's second and third reasons gain more traction. (Pl.'s Br. at 13-18.) While it was proper for the ALJ to consider the effectiveness of the treatment plaintiff received, see 20 C.F.R. § 404.1529(c)(3)(iv), he appears to have engaged in the "cherry picking" the Seventh Circuit forbids. See Scott v. Astrue, 647 F.3d 734, 740 (7th Cir. 2011) ("The ALJ was not permitted to 'cherry-pick' from those mixed results to support a denial of benefits."). This sort of error is particularly harmful in cases involving bipolar disorder, as "people with the disease experience fluctuations in their symptoms, so any single notation that

30

a patient is feeling better or has had a 'good day' does not imply that the condition has been treated." Id.

The ALJ cited five pieces of evidence from the record in support of his finding that plaintiff's condition improved with treatment. The first three were from March and April 2014 (Tr. at 19, citing Tr. at 291, 295, 298), more than a year before the alleged onset date. The Commissioner responds that these records are still relevant, as they show that plaintiff's condition can be improved with medication. (Def.'s Br. at 16.) The problem is that the improvement did not last. In July 2015, plaintiff reported that she had quit her job and that her mood had gone "downhill." (Tr. at 316.) After a brief period of improvement in late 2015/early 2016 (Tr. at 319-29, 406-09), she experienced another downturn in February 2016, requiring a medication change (Tr. at 415-19).

The fourth item the ALJ cited was an April 2016 note recording improvement on Loxitane (Tr. at 19, citing Tr. at 449), but that improvement was also short-lived. By July 2016, plaintiff reported "not doing well"; the psychiatrist concluded that she had "failed Loxitane" and switched to Latuda (Tr. at 476). At a follow up later that month, plaintiff reported that she did "not feel as agitated as she did on the Loxitane, but continues to feel significantly depressed. . . . At this point in time she is mainly spending her time at home because she is unable to psychiatrically manage much more than that." (Tr. at 483.) Notes from September and November 2016 reflect that she continued to struggle with only slight improvement. (Tr. at 511, 528.) While an ALJ is not required to discuss every piece of evidence in the record, he may not select a single "high-water mark" over the course of a year as indicative of the claimant's long-term condition. Yurt, 758 F.3d at 859.

The fifth and final item was an October 2017 note indicating plaintiff's mania was "better"

31

on lithium. (Tr. at 19, citing Tr. at 652). But she continued to be depressed at that time, crying easily. (Tr. at 652.) Again, the ALJ may not selectively consider treatment records, discussing only that evidence favoring his ultimate conclusion; he must confront the contrary evidence and explain why it was rejected. Stephens, 888 F.3d at 329.

The Commissioner notes that conditions controlled by medication are not disabling. (Def.'s Br. at 13, citing Prochaska v. Barnhart, 454 F.3d 731, 737 (7th Cir. 2006).) However, the ALJ made no finding that plaintiff's symptoms were controlled, but rather that they improved. As indicated, that finding was based on a selective reading of the record. "Moreover, one's medical condition could improve drastically, but still be incapable of performing . . . work. The key is not whether one has improved (although that is important), but whether they have improved enough to meet the legal criteria of not being classified as disabled." Murphy v. Colvin, 759 F.3d 811, 819 (7th Cir. 2014).

As the Seventh Circuit noted in Bauer v. Astrue, 532 F.3d 606, 609 (7th Cir. 2008) (internal citations omitted):

> A person who has a chronic disease, whether physical or psychiatric, and is under continuous treatment for it with heavy drugs, is likely to have better days and worse days; that is true of the plaintiff in this case. Suppose that half the time she is well enough that she could work, and half the time she is not. Then she could not hold down a full-time job. That is likely to be the situation of a person who has bipolar disorder that responds erratically to treatment. That is another point that the administrative law judge overlooked.

As the medical evidence summarized above indicates, plaintiff's symptoms varied over time, and the new medications her psychiatrist prescribed produced only short-term improvement. This does not mean the ALJ was required to accept plaintiff's allegations of total disability, but the evidence he cited does not provide the necessary support for his finding.

As his third reason, the ALJ wrote that plaintiff's symptoms "did not appear to interfere

significantly with her daily activities, as evidenced by her ability to prepare meals, perform household chores, drive, shop, and handle finances." (Tr. at 19, citing Tr. at 198-99.) While an ALJ is required to consider the claimant's activities in evaluating credibility, he may not disregard a claimant's limitations in performing such activities. Moss v. Astrue, 555 F.3d 556, 562 (7th Cir. 2009). In the function report the ALJ cited, plaintiff indicated that some days she could not even get out of bed due to depression and anxiety. (Tr. at 197.) On days when she did get out of bed, she would perform some chores, but she prepared only simple meals (Ramen noodles, sandwiches, frozen pizza), and her mother and husband helped with the dishes and laundry. (Tr. at 198.) She sometimes drove, but it gave her anxiety and she felt like she was going to gave a panic attack while driving. (Tr. at 199.) She usually shopped with her husband, not alone, in case she had an anxiety attack. (Tr. at 199.) In her testimony, plaintiff similarly indicated that some days she did not get out of bed, on others she might clean the bathroom or do some laundry. (Tr. at 40-41.) She testified that she shopped with her husband, getting what they needed and leaving the store. (Tr. at 41.) She made similar statements to Dr. Krawiec (Tr. at 364-65), who diagnosed specific phobias of driving and leaving the house alone (Tr. at 367).

The Commissioner indicates that the ALJ alluded to plaintiff's qualifications earlier in his decision. (Def.'s Br. at 18, citing Tr. at 19.) However, he did not account for them in making his finding. The Commissioner also contends that the ALJ did not cite the activities as proof plaintiff could work full-time, but rather as evidence she could no more than she claimed. (Def.'s Br. at 18.) I agree the ALJ did not make that mistake, see Moore v. Colvin, 743 F.3d 1118, 1126 (7th Cir. 2014) (noting "a problem we have long bemoaned, in which administrative law judges have equated the ability to engage in some activities with an ability to work full-time,

33

without a recognition that full-time work does not allow for the flexibility to work around periods of incapacitation"), but he did, as discussed, run afoul of the Seventh Circuit's line of cases holding that an "ALJ cannot disregard a claimant's limitations in performing household activities." <u>Moss</u>, 555 F.3d at 562 (citing <u>Craft</u>, 539 F.3d at 680; <u>Mendez v. Barnhart</u>, 439 F.3d 360, 362 (7th Cir. 2006)). The ALJ was not required to accept these limitations, but he could not ignore them, and it is hard to see how plaintiff's activities, as qualified, are "generally normal." (Tr. at 17.) The matter must be remanded for reconsideration of plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms.

### III. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision, pursuant to 42 U.S.C. § 405(g), sentence four. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 16th day of April, 2020.

s/ Lynn Adelman
LYNN ADELMAN
District Judge

34